IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



UNITED STATES OF AMERICA

v.

GURPREET SINGH BAJWA,

*Defendant.*

**UNDER SEAL**

Case No. 1:20-MJ-3

---

## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT</u>

I, James G Moran Jr, being duly sworn, state:

### INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since 2017.   From 2017 to the present, I have been assigned to a white-collar crime squad at the Washington Field Office that focuses specifically on the investigation of healthcare crimes, including healthcare fraud and other healthcare-related offenses.   My particular investigative focus during past two years has been on the illegal distribution and diversion of prescription drugs.   During this time, I have executed multiple search and arrest warrants related to prescription-drug-distribution investigations.   I also have attended law-enforcement training programs focused on prescription-drug crimes.

2.      This affidavit is submitted in support of a criminal complaint and arrest warrant charging Gurpreet Singh BAJWA with distribution of amphetamine/dextroamphetamine (brand name "Adderall"), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3.     The information contained in this affidavit is based on my personal participation in the investigation of this case and, information provided to me by other federal, state, and local law enforcement agents and officers, and other information and data gathered during the course of this investigation.   This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts that are necessary to establish that probable cause exists to charge BAJWA with the offense listed in the criminal complaint.

4.     Based on my training and experience, review of medical guidance, and information relayed to me by other agents who specialize in the investigation of prescription drug trafficking, I know certain types of prescription drugs are often abused by users seeking the "high," the "rush," or the state of euphoria they produce.

5.     Adderall—which in its generic form is known as dextroamphetamine/ amphetamine—is a commercially available, pharmaceutical stimulant typically used to treat attention-deficit hyperactivity disorder, also known as "ADHD," and narcolepsy.   Adderall increases a patient's alertness, attention, and energy, and it is available only by prescription written by a physician acting in the usual course of his or her professional practice.   Adderall is classified as a Schedule II controlled substance by the Drug Enforcement Administration (DEA). A Schedule II controlled substance is one that has a high likelihood of causing severe psychological and physical dependence in users and has a high potential for abuse.   Adderall comes in both tablet and capsule form, in various dosage strengths from five milligrams (5 mg) to thirty milligrams (30 mg) and in immediate release and extended release formulations.

6.     When abused, Adderall may be taken in excess; crushed and snorted; crushed, dissolved and injected into a vein; or crushed and smoked.   Doing this is said to produce a

desired "rush" or feeling of euphoria as well as other side effects. Adderall is often abused along with other prescription and/or illicit drugs for the desired purpose of achieving a better or extended "high." Adderall is frequently sold illegally by individuals who obtain them by prescription or otherwise, with the street value of these pills varying from $.30 to $1 per milligram. When taken in excess or by unintended means such as snorting or injecting the crushed tablets, the use of Adderall can lead to overdose and death.

7.    Additionally, as a result of my training and experience, I know that the Prescription Drug Monitoring Programs (PDMP) consist of statewide electronic databases, which collect designated data on prescription controlled substances dispensed within the individual states. In the Commonwealth of Virginia, the PDMP is known as the Prescription Monitoring Program (PMP). The PMP collects prescription data from pharmacies for Schedule II through IV controlled substances. As such, the accuracy of the information depends on the correct input of the information by the pharmacies. In my experience, the information entered into the PMP is reliable, subject only to human error. Law Enforcement utilizes the PMP solely as an investigative tool.

## RELEVANT STATUTES

8.    Title 21 United States Code, Section 841(a)(1) makes it an offense for any person to knowingly or intentionally distribute or dispense a controlled substance, except as authorized by law. For physicians registered with the Attorney General under 21 U.S.C. § 822 (a)(2), 21 C.F.R. § 1306.04(a) requires that for a prescription for controlled substance to be effective, it "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of the controlled substances is upon the prescribing practitioner, but a corresponding

3

responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C § 829) and the person knowingly filling such purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.      Title 21, United States Code, Section 841(a)(1) is violated when the physician's authority to prescribe controlled substances is being used not for the treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or dispensing substances for a non-legitimate medical purpose.

## INVESTIGATION

10.     Dr. Gurpreet Bajwa is a primary care physician (NPI 1861486672) operating a family medicine practice located in Fairfax, Virginia, in the Eastern District of Virginia. During all relevant times, by virtue of DEA and Virginia licensure, he was authorized to prescribe, administer, and dispense controlled substances listed in Schedules II, III, IV, and V in the Commonwealth of Virginia.

11.     The FBI opened an investigation into BAJWA after it received information from four separate law enforcement agencies in Northern Virginia regarding prescriptions from BAJWA being connected to local drug trafficking networks and patient overdoses. Additionally, the FBI was aware that BAJWA had been investigated by the Virginia Department of Health Professions (DHP) in 2012 related to controlled substance prescriptions; as a result of that investigation, the Virginia Board of Medicine suspended BAJWA's medical license for approximately two months.

4

12.     In the course of the FBI investigation, I requested and analyzed PMP prescription drug data related to BAJWA's prescriptions, which indicated a high volume of controlled substance prescriptions issued to patients in unusual manners or patterns, to include: (1) monthly supplies of pharmaceuticals prescribed more often than once per month; (2) multiple members of the same family being prescribed the same controlled substance medications; and, (3) patients traveling from long distances to obtain prescriptions for controlled substances from BAJWA.

13.     Specifically, during this investigation, I requested and received a PMP report for the controlled substance prescriptions filled under BAJWA's name and DEA number during the period January 2017 through September 2018.  This PMP report indicated that during this 21-month period, BAJWA issued approximately 15,000 controlled substance prescriptions to more than 1,000 patients – a total of more than 700 controlled substance prescriptions per month. These prescriptions included a wide variety of controlled substances to include narcotics like oxycodone, stimulants like Adderall, and sedatives and benzodiazepines like Xanax.  The PMP data indicated that during this 21-month period, prescriptions from BAJWA for approximately 120,000 dosage units of narcotics, 300,000 dosage units of stimulants and 500,000 dosage units of sedatives were filled at pharmacies in Virginia.  During this period, BAJWA had patients with listed addresses in Virginia, Washington, D.C., Maryland, West Virginia and Florida, along with several other states.   I also reviewed PMP data for BAJWA for the years 2015 and 2016 and saw similar medications being prescribed by BAJWA during that time period.  Based on my training and experience, I believe these patterns are indicative of illegal diversion of prescription drugs. And indeed, based on multiple witness interviews, I know that several area pharmacies had flagged BAJWA and would no longer fill prescriptions from him based on his prescription practices.

14.     As noted above, when the FBI opened its investigation, it was aware that DHP had previously investigated BAJWA for his prescription practices, and his license was suspended as a result.  In 2018, during the course of this investigation, the FBI learned DHP was again investigating BAJWA based on at least four separate complaints filed against him between in and around March 2017 and May 2018.

15.     One of these complaints came from an anonymous pharmacy, which reported that BAJWA was prescribing his patients suspicious quantities of controlled substances to include Adderall.  A second complaint came from a court-related Family Services Specialist citing child protection issues related to BAJWA's prescribing of narcotics and Adderall, among other drugs, to both a husband and wife who were prior heroin addicts.  The third complaint was received from the mother of a former patient of BAJWA who overdosed and died.  The overdose appeared to be related to both illicit and prescription drugs, and the mother of the victim alleged that BAJWA continued to prescribe to her son even after being informed that he was a substance abuser who was actively in drug rehab.  The final complaint came from a source who reported concerns with BAJWA's prescribing to a patient who had several non-fatal overdoses and continued to get prescriptions thereafter from BAJWA.

## UNDERCOVER ACTIVITIES

*Undercover #1 (UC-1) Office Visit*

16.     On or about February 22, 2018, an undercover law enforcement officer (UC-1) went to a medical appointment at BAJWA's office.  UC-1 was instructed to request narcotic pain medications from BAJWA during the visit.  When UC-1 informed BAJWA that he had previously been prescribed oxycodone by a doctor in New York, BAJWA stated that he didn't treat for pain management and didn't prescribe that type of medication.  BAJWA thereafter

issued UC-1 a refund of his office visit fee and handed UC-1 a pre-printed list of doctors that UC-1 could contact for pain management. No prescriptions were issued by BAJWA as a result of this visit. Unbeknownst to the FBI at that time, however, a DHP investigator had been to BAJWA's office just one week before, to request the patient file of a BAJWA patient who had recently overdosed and died.

*Undercover #2 (UC-2) Office Visits*

17. Between in and around June and August 2018, a second undercover officer (UC-2) conducted a series of controlled purchases of Adderall from one of BAJWA's patients (CD-1). During one controlled buy, CD-1 told UC-2 about his relationship with BAJWA. CD-1 stated that during his first visit to BAJWA, he filled out a short questionnaire with generic questions about his health and mental health in order to begin receiving prescriptions. During a subsequent controlled buy, CD-1 advised UC-2 that the only way to see BAJWA was through a referral from an existing patient. In subsequent text communications between CD-1 and UC-2, CD-1 told UC-2 that "he'll [BAJWA] give you unlimited aderall [sic], zan and ambience...Ambien. For sleep . . . ." Based on my training, experience, and knowledge of this case, I understand that "zan," in this text, refers to Xanax, another controlled substance that is often abused and is a sedative." Thereafter, UC-2 purchased a "referral" to BAJWA from CD-1 for $300.

18. Between in and around August 14 and October 9, 2018, a period of 56 days, UC-2 visited BAJWA's office for medical appointments with BAJWA on four separate occasions. These visits took place on or about August 14, September 4, September 20, and October 9, 2018. At each visit, UC-2 paid cash to BAJWA's receptionist in advance of meeting with BAJWA, and thereafter, met with BAJWA and received a prescription from him for a thirty-day supply of Adderall. UC-2 called BAJWA's medical practice ahead of time to make an appointment for the

first visit on August 14, 2018; however, for the following three visits, UC-2 simply walked into the practice without an appointment, signed in, paid a fee, and thereafter was seen by BAJWA. Each of these visits was audio and video recorded by the FBI.

19.     During the September 4 visit, in which BAJWA provided UC-2 with a prescription for 30 Adderall 20-mg tablets written to be taken one tablet per day (another 30-day supply), UC-2 asked BAJWA if he would be willing to see a "chick" who was a friend of UC-2. UC-2 described this "chick" to BAJWA as a "fitness model" who wanted to use Adderall to "keep her going with her fitness stuff" (*i.e.*, to provide her with energy to exercise, which I do not believe is a medically valid use of Adderall). UC-2 then asked BAJWA, "Umm, do you take referrals?" BAJWA responded, "...yeah, that's fine" and told UC-2 to have the woman call the office and he'd talk to her first.

*Undercover #3 (UC-3) Office Visits*

20.     Between in and around September 6 and October 5, 2018, a period of 29 days, the FBI utilized a third undercover officer (hereinafter UC-3) to record three separate medical appointments with BAJWA at BAJWA's office. These visits occurred on September 6, September 20, and October 5. At each of these visits, UC-3 paid cash to BAJWA's receptionist in advance of meeting with BAJWA, and thereafter met with BAJWA and a received a prescription from him written to be at least a 30-day supply of Adderall. All of these visits with BAJWA took place at his medical practice. UC-3 called BAJWA's office in advance to make an appointment for the first visit on September 6, 2018. For the two other visits, UC-3 simply walked into BAJWA's office without an appointment, signed in, paid a fee and thereafter was seen by BAJWA. All of these visits were audio and video recorded by the FBI.

8

21. During the September 6 visit, UC-3 introduced herself as being a friend of UC-2 — the "chick" that UC-2 had described to BAJWA at UC-2's visit on or about September 4 — and explained to BAJWA that she made money as a fitness trainer, but had just had a baby and did not have the energy she used to have. UC-3 told BAJWA that UC-2 gave her one of his Adderall and, "I've had the best workout I've ever had," "I felt like I could run a hundred miles," and "I wasn't even as hungry as I normally am." This visit was audio and video recorded. During the visit, BAJWA measured UC-3's blood pressure using a blood pressure cuff and used a stethoscope to listen to her chest and back. BAJWA did not measure UC-2's blood pressure nor did he listen to UC-2's chest or back using a stethoscope during any of UC-2's visits. BAJWA informed UC-3 that her blood pressure was high "150/80" and that it would be good to be on something for her blood pressure. BAJWA asked UC-3 a series of general health questions and gave UC-3 the same pre-printed form to fill out. Despite UC-3's apparent high blood pressure, BAJWA prescribed UC-3 30 Adderall 20-mg tablets to be taken one tablet per day (a 30-day supply) and told UC-3 to come back in one month. Prior to seeing BAJWA for this visit, UC-3 paid $130.00 to BAJWA's receptionist in the patient lobby area.

22. Only two weeks later, on September 20, UC-3 returned to BAJWA's office without having made any appointment. The visit was audio and video recorded. When BAJWA walked into the exam room with UC-3, he was observed to be holding only a cellphone and what appeared to be a prescription pad in his hands. During the visit, UC-3 did not observe BAJWA to have her patient file with him in the exam room. At the beginning of this visit with BAJWA, BAJWA asked UC-3, "You're here for refills, correct?" UC-3 responded that she was and BAJWA said, "Okay, good." BAJWA said, "Let me just check the dates real quick and I'll get your refills." BAJWA asked how the medicine was working and UC-3 told BAJWA the

Adderall was working "really, really well" and "my workouts are great," and said, "…just have a lot more energy." During the visit, BAJWA asked UC-3 for her date of birth which UC-3 then stated out loud. Thereafter, UC-3 observed BAJWA appearing to enter her date of birth into his phone in order to check her medical data. In response to a question from BAJWA about the adequacy of her dosage, UC-3 said, "I think I need more of it." BAJWA responded that he could up it to "twice a day if you want."

23.    In this same visit, UC-3 also told BAJWA she gave one of her Adderall® tablets to one of her fitness clients, and that the medication worked really well for the client. UC-3 asked BAJWA if he would be willing to see this client as a patient, and BAJWA said this person could call the office to make an appointment. BAJWA wrote UC-3 a 30-day prescription that doubled the dosage from the prescription she had received from BAJWA just two weeks prior, from 30 tablets to 60 tablets of 20-mg Adderall. Then, UC-3 asked BAJWA when she could come back in again and he said she could come back in when this prescription ran out, which he said should be in 30 days. UC-3 thereafter told BAJWA she gave her client "a couple" of the pills. Thereafter, BAJWA could be heard saying, "Okay…that's fine." BAJWA then told UC-3 to come back when this prescription was close to running out. This visit between UC-3 and BAJWA lasted approximately four minutes. UC-3 paid $90 in cash to BAJWA's receptionist for her visit fee prior to seeing BAJWA.

24.    During UC-3's last appointment with BAJWA, on October 5 — fifteen days after UC-3's second visit with BAJWA where he doubled her dosage of Adderall — UC-3 returned to BAJWA's office without having made any appointment. At the beginning of this visit, BAJWA asked UC-3, "Alright, just refills for you?" UC-3 responded, "Yes, please." UC-3 then reminded BAJWA that she'd told him previously about her "friend" who wanted to come see

10

him.  UC-3 told BAJWA that she had been giving her "friend" some of UC-3's pills to help her friend with her workouts.  UC-3 further told BAJWA that her "friend" just started a new job and wouldn't have time off to come see him until the end of the month.  UC-3 asked BAJWA, "Is there any way that I could get some more on my prescription to give to her…like ten or fifteen?"  UC-3 then reminded BAJWA that the last time he gave her 60 tablets and then asked him if she could have 75 tablets.  BAJWA replied, "Okay, I can give you 70, that's fine."  BAJWA then handed UC-3 the prescription for 70 tablets of 20-mg Adderall, and the visit concluded with BAJWA and UC-3 departing the exam room.  UC-3 paid $90 cash to BAJWA's receptionist for her visit fee prior to seeing BAJWA.  BAJWA's interactions with UC-3 in the exam room totaled approximately one minute and 15 seconds.  The prescription UC-3 received on October 5 was UC-3's third 30-day supply of Adderall from BAJWA in a period of just 29 days.

## CONCLUSION

Based upon the foregoing, there is probable cause to believe that on or about October 5, 2018, in the Eastern District of Virginia, GURPREET SINGH BAJWA., knowingly, unlawfully, and intentionally distributed dextroamphetamine-amphetamine, commonly known as Adderall, a Schedule II controlled substance in violation of Title 21, United States Code, Sections 841(a)(1).

Respectfully submitted,

James G Moran Jr
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this _____ day of January, 2020

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

11